IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CITY OF VALPARAISO, )
)
Plaintiff, )          CASE NO.: 09-cv-00135
)
vs. )
)
UNITED STATES AIR FORCE; )
MICHAEL B. DONLEY, Secretary, )
United States Air Force; UNITED )
STATES DEPARTMENT OF DEFENSE; )
ROBERT M. GATES, Secretary, )
Department of Defense )
)
)
Defendants. )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      This is an action seeking relief from the final decision of the United States

Air Force ("USAF") ordering the beddown of 59 fighter aircraft, referred to alternatively

as the Joint Strike Fighter ("JSF") or F-35, at Eglin Air Force Main Base ("Eglin Main

Base"), and the construction of associated facilities in violation of the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Noise Control

Act, 42 U.S.C. § 4901 *et seq.*  The USAF's final decision is set forth in the *Record of*

*Decision Implementation of Base Realignment and Closure (BRAC) 2005 Decisions for*

*the Joint Strike Fighter (JSF) Initial Joint Training Site (IJTS) Eglin AFB, Florida*

("ROD"), which was executed on February 5, 2009.  The relief requested is: (1) a

declaratory judgment that the USAF has violated NEPA in reaching its final decision by (a) failing to consider a reasonable range of alternatives, (b) failing to adequately consider environmental impacts, (c) failing to prepare adequate environmental documentation, and (d) committing resources prematurely; (2) a declaratory judgment that the USAF has violated the Noise Control Act in reaching its final decision by failing to address and implement Noise Control Act policies; (3) a preliminary injunction enjoining the USAF from implementing its final decision; (4) a permanent injunction enjoining the USAF from implementing its final decision; (5) attorney's fees assessed against the USAF because it has acted in bad faith by demonstrating a complete disregard for NEPA; and (6) such other relief as the Court may deem appropriate.

2.      The ROD implements one of the two major federal actions described in the *Proposed Implementation of the Base Realignment and Closure (BRAC) 2005 Decisions and Related Actions at Eglin AFB, FL Final Environmental Impact Statement* ("FEIS"). The two major federal actions discussed in the FEIS are (1) the relocation of the Army's 7th Special Forces Group ("7SFG") from Fort Bragg, North Carolina to Eglin Air Force Base, and (2) the establishment of the JSF Initial Joint Training Site ("JSF IJTS" or "IJTS") for the JSF at Eglin Main Base.

3.      The "JSF is a multi-role fighter optimized for the air-to-ground role, designed to meet the needs of the Air Force, Navy, and Marine Corps with improved survivability, precision engagement capability, and the mobility necessary for future joint operations." *FEIS*, pg. 1-3. There are three versions of the JSF envisioned, all of which the USAF plans to operate at Eglin Air Force Base. First, there is the F-35A, Conventional Take-Off and Landing ("CTOL"), which uses "conventional Air Force

aircraft landing and recovery techniques." *FEIS*, pg. 2-58. Second, there is the F-35B, Short Take-Off and Vertical Landing ("STOVL"), which "[p]ermits short takeoff launch and vertical landing recovery" from various naval vessels. *Id.* Third, there is the F-35C, Carrier Variant ("CV"), which permits use on Navy Aircraft Carriers. *Id.* "Establishing the JSF IJTS at Eglin AFB would consolidate the initial training instruction of entry level pilots and maintenance technicians for the U.S. Air Force, Navy and Marine Corps." *FEIS*, pg. 1-3.

4.      Specifically with regard to the IJTS, the FEIS outlined two proposed alternatives for cantonment areas and two proposed alternatives for JSF flight training. These two alternatives remained constant throughout the USAF's NEPA process. However, for purposes of this lawsuit, it is imperative to note that these alternatives both assumed that the beddown of the JSF must take place at Eglin Main Base. In other words, both proposed cantonment areas were to be situated on Eglin Main Base. Likewise, both JSF flight training alternatives assumed that the JSF aircraft would be bedded down at - that is housed at - Eglin Main Base.

5.      The FEIS was made available to the public in October, 2008. The FEIS is incorporated herein by reference. The FEIS is too voluminous to be attached hereto, so it will be filed under separate notice. The FEIS is incorporated herein by reference.

6.      On February 5, 2009, the USAF issued the ROD, thereby implementing a portion of the FEIS regarding the JSF and IJTS.[1] The ROD will be filed under separate

---

[1] The USAF issued a Record of Decision with regard to relocating the 7SFG to Eglin Air Force Base on November 20, 2008. *See* 73 Fed. Reg. 74148 (Dec. 5, 2008).

notice as Exhibit "A."[2] The ROD is incorporated herein by reference. NEPA and its governing regulations, including the USAF's own regulations, required the issuance of the FEIS and its predecessor draft environmental impact statement ("DEIS")[3] prior to the issuance of the ROD.

7.     The ROD orders the beddown of 59 JSF aircraft, as well as the construction of the associated cantonment areas (dormitories, dining facilities, etc.), flight instruction facilities (e.g. classrooms), maintenance facilities and hangers for the JSF and IJTS at Eglin Main Base. The estimated cost of construction for the facilities authorized by the ROD is $160,180,000.00.

8.     The beddown of 59 JSF aircraft at Eglin Main Base is different than what was discussed in the DEIS and FEIS. In both the DEIS and FEIS, the USAF indicated that it intended to beddown 107 JSF aircraft at Eglin Main Base. There was no discussion, in either the DEIS or FEIS, of bedding down less than 107 JSF aircraft at Eglin Main Base. Regardless of the number of JSF aircraft, be it 59 or 107, it is the beddown at Eglin Main Base, without consideration of any other alternative beddown location, that is perhaps the greatest failing of the USAF in employing the NEPA process.

9.     The ROD purportedly places temporary limitations on JSF flight training operations to purportedly minimize noise impacts on Plaintiff, City of Valparaiso. However, the ROD admits that these temporary limitations are not practical for long-term

---

[2] The undersigned has been advised by the Clerk's office that the electronic filing system can upload a maximum of 5 MB of electronic information at one time. Due to the size of the instant pleading and its exhibits, it is necessary for the City to file this pleading and its exhibits separately. The exhibits to this pleading, although filed under separate notice, are all incorporated herein by reference.

[3] The full title for the DEIS is the *Proposed Implementation of the Base Realignment and Closure (BRAC) 2005 Decisions and Related Actions at Eglin AFB, FL Draft Environmental Impact Statement.*

use and will be cancelled or modified in the future in order to support the operation of 59 JSF aircraft at Eglin Main Base.

10.  These temporary limitations are not, in fact, very limiting and will not address the noise impacts, predicted by the USAF, to the Plaintiff. Indeed, a review of the noise modeling in the FEIS of the 107 JSF aircraft reveals that the USAF assumed very constraining, perhaps unrealistically constraining, operational restrictions as part of the USAF's noise models. Even with these artificial constraints imposed on JSF operations as part of the model assumptions, the predicted noise impacts are prohibitively severe and will have a devastating impact on the City. Importantly, the operational constraints assumed in the USAF's noise modeling on flight training operations are more restrictive on flight training operations than the "limitations" imposed on flight training operations in the ROD. Even with the more restrictive operational constraints in the USAF's noise modeling, compared to the temporary "limitations" in the ROD, the USAF's noise modeling predicts prohibitive, devastating noise impacts on Valparaiso and the City's properties, employees and operations.

11.  At this time, the City is unaware of any noise modeling for noise impacts relating to the operation of 59 JSF aircraft. No such information was included in the DEIS or FEIS. Furthermore, the City has diligently attempted to acquire information from the USAF regarding the JSF IJTS through the Freedom of Information Act ("FOIA"); however, the USAF has stonewalled, refusing to provide the City with any meaningful information, which has resulted in the City filing a lawsuit under FOIA. That matter, case number 3:08-cv-00420-MCR-MD, is currently pending in this District.

12.  The USAF did model the noise impact of 42 JSF aircraft, which is the

5

number of JSF aircraft that were to be delivered to, and operating out of, Eglin Main Base by 2013. This modeling for the 42 JSF aircraft, which is discussed for the first time in the FEIS, still predicted prohibitive adverse noise impacts to Valparaiso, even though this modeling effort assumed the same operational constraints assumed in the USAF's noise modeling for the 107 JSF aircraft. It is reasonable to conclude that 59 JSF aircraft, bedded down under the ROD, conducting operations out of Eglin Main Base, will result in higher noise levels and greater adverse noise impacts to the City than the adverse impacts predicted when the USAF modeled 42 JSF aircraft.

13. Addressing the possibility of bringing the full complement of 107 JSF aircraft to Eglin Main Base, as was discussed in both the DEIS and FEIS, the ROD states that "it remains the Air Force['s] proposal to base the 107 [JSF aircraft] discussed in the FEIS (Chap. 2, et al.) at Eglin AFB." *ROD,* pg. 2. The ROD states that a decision on where to beddown the additional 48 aircraft at Eglin Air Force Base will be deferred until completion of a Supplemental Environmental Impact Statement (SEIS). The "anticipated" date of completion of this SEIS is September, 2010. The ROD does not, and cannot, make any guarantee, however, that an SEIS will be completed by 2010, or on any future date for that matter. Nevertheless, the ROD commits to bedding down 59 JSF aircraft at Eglin Main Base by 2016.

14. The inability of the ROD to guarantee an SEIS by September, 2010, coupled with the USAF's admission that the purported temporary limitations placed on JSF flight training operations are not practical for long-term use, presents the real probability of the cancellation or modification of these limitations, thus allowing unlimited operations of the 59 JSF aircraft, without an SEIS being completed beforehand.

Given the USAF's willingness to ignore NEPA thus far, it is not unreasonable to conclude that the ROD's temporary limitations will be cancelled or modified if the SEIS takes a longer-than-expected time to issue.

15. The ROD's implementation of the portion of the FEIS dealing with the JSF and IJTS is unlawful in that the FEIS failed to satisfy several criteria specifically delineated in NEPA, NEPA's governing regulations, and the USAF's own governing regulations. For example, the USAF did not consider a reasonable range of alternatives in the FEIS. Indeed, the ROD expressly acknowledges that "some potentially feasible beddown and operational alternatives *were not subjected to detailed analysis* to determine whether they should be carried forward to the DEIS, because the Air Force determined that the stated BRAC and Air Force purposes and needs would not be met by them." *ROD*, pg. 5 (emphasis supplied). Even if these alternatives would not meet the stated "BRAC or Air Force purposes and needs," there is no lawful authority for the USAF to refuse to consider these self-admitted feasible alternatives.

16. NEPA expressly applies to the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, § 2901, 104 Stat. 1808 (1990)(as amended at 10 U.S.C. § 2687)(hereinafter cited and referred to as the "BRAC Act") and the Defense Base Closure and Realignment Commission's recommendation[4] in 2005 to establish the IJTS at Eglin Air Force Base. Neither the BRAC Act nor the Commission's Recommendation supports the USAF's assertion that BRAC required the beddown of the JSF only at Eglin Main Base. Additionally, the USAF's "purposes and needs" do not supersede NEPA. Accordingly, the USAF's final decision to beddown 59 JSF at Eglin

---

[4] For purposes of this pleading, the "Commission" shall mean the Defense Base Closure and Realignment Commission and the "Commission's Recommendation" shall mean the recommendation to establish the IJTS at Eglin Air Force Base.

Main Base, as well as construct the associated facilities, is unlawful under NEPA due to the USAF's failure to consider a reasonable range of alternatives, including, but not limited to, adjusting the runways, adjusting the flight paths, constructing a new airfield, or bedding down the JSF at either Duke Field or Choctaw Field, two other airfields that already exist on Eglin Air Force Base, or at any of the other airfields within the 724 square miles of Eglin Air Force Base.

17.    The USAF's final decision, embodied in the ROD, has also (1) failed to adequately consider environmental impacts, (2) failed to prepare adequate environmental documentation, and (3) unlawfully committed resources prematurely.   Moreover, the USAF's final decision is in violation of the Noise Control Act.

Jurisdiction and Venue

18.    This action arises under NEPA, 42 U.S.C. § 4321 *et seq.*, and the Noise Control Act, 42 U.S.C. § 4901 *et seq.*

19.    This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 701-706, 28 U.S.C. § 1331, 28 U.S.C. § 2201-2202, and Section 2905(c)(3), BRAC Act.   Venue lies in this District under 28 U.S.C. § 1391.

20.    An actual, justiciable controversy now exists between Plaintiff and Defendant USAF, and the requested relief is therefore proper under 28 U.S.C. §§2201-2202 and 5 U.S.C. §§ 701-706.

Parties

21.    Plaintiff, CITY OF VALPARAISO ("Plaintiff," "City" or "Valparaiso"), is an incorporated municipality in Okaloosa County, Florida.   Plaintiff is charged with

preserving the rights of the citizens of Valparaiso, as well as protecting the safety, health and general welfare of the citizens of Valparaiso. As a municipality, Plaintiff is authorized to sue and be sued in the courts of Florida as well as the federal courts.

22. The City is governed by a City Commission, comprised of five elected officials, one of whom is the Mayor of the City. Through its City Commission, the City carries out its official duties and exercises those powers vested unto it by Florida law.

23. Defendant, UNITED STATES AIR FORCE ("USAF" or "Defendant USAF"), is the branch of the United States Armed Forces that has developed and issued the ROD which beds down the 59 JSF aircraft at Eglin Main Base. The USAF is the branch of the United States Armed Forces responsible for Eglin Air Force Base. Eglin Air Force Base is comprised of 724 square miles. Eglin Main Base is that airfield at which the Headquarters of Eglin Air Force Base is located, as well as multiple hangers, laboratories, base housing, and a variety of other buildings and services. Eglin Main Base has two operational runways, 12/30 and 01/19. There are several different airfields within Eglin Air Force Base. These include, but are not limited to, Eglin Main Base, Duke Field, Hurlburt Field and Choctaw Field. Eglin Air Force Base encompasses hundreds of square miles of undeveloped land. For demonstrative purposes, Exhibit "B," filed under separate notice and incorporated herein by reference, locates Eglin Air Force Base and demonstrates the size of Eglin Air Force Base, which spans across several counties. Likewise, Exhibit "C," filed under separate notice and incorporated herein by reference, locates Eglin Main Base within Eglin Air Force Base, as well as Duke Field, Choctaw Field and Hurlburt Field.

24. Defendant, MICHAEL B. DONLEY ("Mr. Donley" or "USAF

9

Secretary"), is the Secretary of the USAF and is sued in his official capacity.

25.     Defendant, UNITED STATES DEPARTMENT OF DEFENSE ("DoD"), is the executive branch department of the United States Government with jurisdiction and authority over the USAF.

26.     Defendant, ROBERT M. GATES ("Mr. Gates" or "DoD Secretary"), is the Secretary of the DoD and is sued is his official capacity.

Background

27.     The City is uniquely positioned, in that it is surrounded by Eglin Air Force Base. A significant portion of Eglin Main Base is located within the City's geographical boundaries. For instance, Runway 01/19 lies entirely within the City's geographical boundary. Runway 12/30 lies mostly within the City's geographical boundary. The USAF possesses more than eighty percent of the lands within the City's geographical boundaries. Relative to the USAF, the City is a small municipality with a population of approximately 6,400 people.

28.     The USAF is the entity responsible for implementing the beddown of the JSF and establishment of the IJTS at Eglin Air Force Base pursuant to the Commission's Recommendations. As part of the beddown, the USAF has authored, as was required under NEPA, the DEIS and FEIS.

29.     The USAF is required under NEPA to consider the environmental impacts of the beddown of the JSF at Eglin Air Force Base to the surrounding areas, including, but not limited to, Valparaiso. The DEIS and FEIS were to "present the environmental impacts of the proposal [bedding down the JSF at Eglin] and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice

10

among the options by the decisionmaker and the public." 40 C.F.R. § 1502.14. The DEIS and FEIS were to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.* With regard to these requirements, both the DEIS and FEIS failed miserably.[5]

30. In March of 2008, the DEIS was made available to the public. The information contained therein alarmed the City. The DEIS proposed bedding down 107 JSF aircraft at Eglin Main Base. These 107 JSF aircraft would perform significantly more annual operations at Eglin Main Base than the F-15, the fighter plane they are displacing. The DEIS estimated that there would be 121,286 annual JSF flight training operations at Eglin Main Base, as compared to the 29,206 operations presently being flown at Eglin Main Base by the F-15. An "operation" is the number of times an aircraft crosses the end of a runway, at Eglin Main Base.

31. The drastic increase in number of operations alone will result in an increase in noise levels surrounding Eglin Main Base. However, it is not just the increase in operations that concerned the City. The City was also concerned because, according to the USAF, the JSF is significantly louder than the F-15.

---

[5] The portions of the DEIS and FEIS that are cited in this pleading are filed under separate notice and incorporated herein by reference as Exhibits "D" and "E," respectively. By attaching these sections, however, Plaintiff is not waiving its right to refer to other sections of the DEIS or FEIS at a later date. Indeed, the DEIS and FEIS should be included in the administrative record compiled by the USAF in support of its decision in the ROD. Accordingly, Plaintiff expressly reserves the right to cite to, or quote from, the DEIS, FEIS, or, for that matter, any other item contained in the administrative record in subsequent motions or other documents filed with this Court or related to this matter.

32.    For instance, the DEIS noted, at page E-25,[6] that "[a]t military takeoff power, noise from the F-35 is about 9 dB higher (or twice as loud) than the F-15C at military takeoff power." Furthermore, "[d]uring approach, noise from the F-35 is about 19 dB higher than noise from an F-15C. This corresponds to the F-35 being about four times as loud as the F-15C." The DEIS also discussed, at page 7-17, non-auditory effects such as "high blood pressure, coronary disease, ulcers, colitis, and migraine headaches which all have been linked to noise and are possible in areas exposed to elevated noise levels."

33.    According to the DEIS, most, if not all, of the City will be exposed to noise levels in excess of 65 dB, which the USAF recognizes as a level of noise that is not suitable for residential purposes. Moreover, a significant portion of the City would be exposed to noise levels greater than 75 dB. According to "DoD recommendations, many noise-sensitive land uses are never considered to be compatible at noise levels greater than 75 dB . . . ." *DEIS*, pg. 7-32. In this regard, "[t]his [DoD] recommendation is driven, in part, by the fact that these land uses often have some outdoor component which cannot be protected from jet noise using structural noise attenuation." *Id.*

34.    Appendix E to the DEIS revealed that, for purposes of noise evaluation, at least eight noise-sensitive facilities within the City limits were in the vicinity of the affected air fields. These noise-sensitive facilities included, Lewis Middle School, Valparaiso Elementary School, the First Assembly of God, the New Hope Baptist Church, the Sovereign Grace Church, the Unitarian church, and two undefined areas of

---

[6] Both the DEIS and FEIS are numbered as follows: Chapter #-Page#. So, 1-1 means Chapter 1, page 1. For the appendices, they are numbered as follows: Appendix-Page#. So, A-1 means Appendix A, page 1. Finally, both the DEIS and FEIS have an executive summary. The executive summary is numbered like this ES-1, where "ES" indicates the executive summary and "1" is the page number.

residential houses. All of these noise-sensitive facilities would be exposed to noise levels in excess of 65 dB, with some being exposed to as much as 84 dB.

35.     The DEIS contemplated only two flight alternatives for the 120,000-plus operations of the JSF out of Eglin Main Base, and found that "[b]oth action alternatives carry substantial noise-related impacts, including annoyance and interruption of activities such as sleeping, conversation, and listening to the television or radio." *DEIS,* pg. 7-31. Furthermore, both flight alternatives required that the JSF beddown at Eglin Main Base, a conclusion that the USAF has erroneously maintained is required by the BRAC Act and Commission's Recommendation.

36.     The DEIS did not contain any significant explanation of how the USAF arrived at the noise contours and predicted noise impacts resulting from the beddown of the JSF at Eglin Main Base. However, the DEIS did conclude that the City would be significantly adversely impacted by the beddown of the JSF at Eglin Main Base because of significant negative noise impacts.

37.     The City provided written comments in response to the DEIS to the USAF on May 9, 2008, that clearly outlined the City's concerns and suggested potential reasonable alternatives that the USAF did not consider in the DEIS. The FEIS, which was released after the City provided its comments, failed to thoroughly analyze and consider, as viable, the reasonable alternatives suggested by the City.

38.     In providing its comments on May 9, 2008, the City meaningfully participated in the NEPA process, as such relates to the DEIS, FEIS, and implementation of the Commission's Recommendation to beddown the JSF at Eglin Air Force Base.

39.     The United States Environmental Protection Agency ("EPA") reviewed

the DEIS and provided its comments to the USAF on May 20, 2008. The EPA noted significant concerns regarding the DEIS, including concerns that the proposal to establish the JSF IJTS and expand operations "may increase impacts beyond Eglin AFB's boundaries, particularly related to potential changes in air quality and extensive noise exposure." As mitigation, the EPA suggested that the USAF purchase any residences exposed to noise levels in excess of 75 dB DNL[7] to help mitigate the noise exposure. It is believed by the City that hundreds of homes will be exposed to noise levels in excess of 75 dB DNL.

40.    At the same time the City was attempting to address the future noise impacts of the JSF with the USAF, through its public comment, etc., the USAF was considering where it would place a future Army & Air Force Exchange Services (AAFES) Lifestyle Center ("Lifestyle Center") at Eglin Air Force Base. The Lifestyle Center was to include two key facilities, such as a Base Exchange and movie theater. Ultimately, the USAF decided not to construct the Lifestyle Center near the West Gate because the noise levels from the JSF will be too great. In other words, the noise levels were so severe they would inhibit the USAF's service members' ability to shop or watch a movie. It does not appear that the USAF shares the same concern for the residents of the City with regard to their ability to live in their homes, sleep, work, attend school or church, shop, or participate in recreational activities outdoors.

41.    The FEIS was made available to the public in October, 2008. Notwithstanding the severe impacts to the City, and ignoring other reasonable

---

[7] DNL is an acronym for Day-Night Average Sound Level. Appendix E of the DEIS explains that "DNL is the community noise metric recommended by the US Environmental Protection Agency (USEPA, 1974) and has been adopted by most federal agencies (FICON, 1992). It has been widely accepted that DNL correlates well with community response to noise (Schultz, 1978: Finegold et al. 1994)." *DEIS*, pg. E-7.

alternatives available to the USAF, the FEIS still focused exclusively on bedding down 107 JSF at Eglin Main Base. The FEIS adopted one of the two flight training alternatives identified in the DEIS, JSF Flight Training Alternative 1, as its preferred alternative. JSF Flight Training Alternative 1 will result, if implemented, in significant noise impacts to the City. In choosing Alternative 1, the USAF ignored the concerns expressed by the City and the EPA and moved forward with the beddown of the JSF at Eglin Main Base, in contradiction to NEPA, NEPA's governing regulations, the USAF's own regulations, and the Noise Control Act.

42.     The USAF never considered any alternative that included bedding down the JSF anywhere other than Eglin Main Base. The USAF's focus on bedding down the JSF at Eglin Main Base has resulted in the USAF's failure to "rigorously explore and objectively evaluate all reasonable alternatives," as it was required to do under the governing NEPA regulations. There are several other airfields located with Eglin Air Force Base, including Duke Field, Hurlburt Field and Choctaw Field. The USAF has acknowledged that both Duke and Choctaw Fields are capable of handling the JSF and currently part of the planned operations for the JSF. Both airfields are removed from populated areas such as Valparaiso. Moreover, Eglin Air Force Base comprises 724 square miles, and contains a significant amount of undeveloped land suitable for construction of a new airfield to beddown the JSF. Nevertheless, the USAF never considered bedding down the JSF at Duke Field, Choctaw Field, any other airfield at Eglin Air Force Base, or, at an entirely new airfield on Eglin Air Force Base.

<u>Base Realignment and Closure Act and Commission</u>

43.     The decision to beddown the JSF at Eglin Air Force Base stems from the

Commission's Recommendation in 2005 to establish the IJTS at Eglin Air Force Base. The Commission's Recommendation with regard to the JSF IJTS is being filed under separate notice and is incorporated herein by reference as Exhibit "F." Nowhere within the Commission's Recommendation is it expressly required that the JSF be bedded down at Eglin Main Base. The BRAC Act expressly applies NEPA to the beddown decision, thereby requiring the USAF to consider a reasonable range of alternatives. The USAF admits, in, among other places, the ROD, that it failed to consider a reasonable range of alternatives, as required by NEPA.

44. The Commission's Recommendation does not require the JSF be bedded down at Eglin Main Base.

Draft Environmental Impact Statement

45. The DEIS presented, for the first time in one place, the USAF's prediction of noise impacts on the City as a result of the operations of the JSF as part of the IJTS. The DEIS foreshadowed horrific noise impacts to the City.

46. The City acknowledges that the DEIS is only one part of the NEPA process, and the City does not seek judicial review of that document. However, to shed light on the systemic avoidance and abuse of the NEPA process by the USAF, while allegedly employing the NEPA process, the City will discuss more of the DEIS than is perhaps customary.

47. The DEIS identified two proposed alternative locations for the cantonment area of the JSF IJTS. Additionally, the DEIS identified two proposed flight training alternatives, identified as JSF Flight Training Alternative 1 and JSF Flight Training Alternative 2. Both cantonment alternatives used existing facilities at Eglin Main Base.

Both Flight Training Alternatives proposed using only Eglin Main Base to beddown the JSF. Noticeably missing from the DEIS was a discussion of any alternative that included bedding down the JSF at any airfield other than Eglin Main Base. Nor did the DEIS consider, as an alternative, the construction of a new runway at Eglin Main Base or the realignment of an existing runway at Eglin Main Base as a means of accomplishing the USAF's mission without risking the potential destruction of Valparaiso.

*Take-offs, landings and operations*

48.     Under JSF Flight Training Alternative 1, "51 percent of the total proposed JSF airfield operations would take place at Eglin AFB [Eglin Main Base] and 35 percent would take place at Duke Field. The remaining 14 percent of airfield operations would take place at Choctaw Field." *DEIS*, pg. 7-13. In comparison, "[u]nder JSF Flight Training Alternative 2, 75 percent of total F-35 airfield operations would occur at Eglin AFB [Eglin Main Base]. Fifteen percent of JSF operations would occur at Duke Field. The remaining 10 percent of airfield operations would take place at Choctaw Field." *DEIS*, pg. 7-24. The total number of operations, under JSF Flight Training Alternative 1, was estimated at 239,875 JSF flight training operations out of Eglin Air Force Base, with 121,286 at Eglin Main Base, 84,956 JSF operations at Duke Field, and 33,633 operations at Choctaw Field.

*Noise from the JSF*

49.     The DEIS noted that at "military takeoff power, noise from the F-35 is about 9 dB higher (or twice as loud) than the F-15C at military take-off power." *DEIS*, Page E-25. Furthermore, "[d]uring approach, noise from the F-35 is about 19 dB higher than noise from an F-15C. This corresponds to the F-35 being about four times as loud as

the F-15C." *DEIS*, Page E-25.

50.    Included in the DEIS were noise contours which visually depict the noise impacts to Valparaiso.  The noise contours are being filed under separate notice and are incorporated herein by reference as Composite Exhibit "G," Figures 7-4 and 7-5 from the DEIS.

51.    The DEIS notes several land uses and their relative compatibility with yearly DNL measurements.  Critical to Valparaiso is the fact that residential uses are considered incompatible with noise levels in excess of 65 dB DNL.  The DEIS notes that "many noise-sensitive land uses are never considered to be compatible at noise levels greater than 75 dB DNL . . . ." *DEIS*, pg. 7-32.  If the ROD is implemented, most of the City, including hundreds of homes, will be exposed to noise level in excess of 65 dB. Moreover, if the ROD is implemented, a significant portion of the City will be exposed to noise levels in excess of 75 dB.

*Persons affected*

52.    The DEIS noted that "[o]f the estimated 2,174 persons living off-base near Eglin and Duke that would be exposed to noise at greater than 75 dB DNL, approximately 37 percent to more than 70 percent (depending on their exact exposure level) would potentially be highly annoyed by [the] noise" of the JSF. *DEIS*, pg. 7-14. Furthermore, a "larger percentage of the population can be expected to be annoyed to a degree less than 'highly' annoyed." *Id.*

53.    Per the DEIS, Table 7-3, 2,113 people living off-base are currently exposed to sound levels in excess of 65 dB DNL.  However, under JSF Flight Training Alternative 1 significantly more people living off-base will be exposed to increased noise

levels from operations of the JSF out of Eglin Main Base and Duke Field. Indeed, according to Table 7-9 of the DEIS, 1,921 additional people living off-base would be exposed to noise levels between 65 to 70 dB DNL from such operations. Furthermore, an additional 691 people living off-base would be exposed to 70 to 75 dB DNL, an additional 664 people would be exposed to 75 to 80 dB DNL, 644 additional people would be exposed to 80 to 85 dB DNL, and an additional 724 people would be exposed to sound levels in excess of 85 dB DNL. Altogether, an additional 4,644 people living off-base will be exposed to sound levels in excess of 65 db DNL. In total, under JSF Flight Training Alternative No. 1, 6,757 people would be exposed to noise in excess of 65 dB DNL, which is an approximate 319 percent increase in off-base persons exposed to noise levels in excess of 65 dB DNL.

54.     The DEIS explains "[n]on-auditory effects such as high blood pressure, coronary disease, ulcers, colitis, and migraine headaches have been linked to noise and are possible in areas exposed to elevated noise levels." *DEIS*, pg. 7-16.

55.     Like JSF Flight Training Alternative 1, JSF Flight Training Alternative 2 would result, if implemented, in a significant increase in off-base population exposed to noise levels in excess of 65 dB DNL. Table 7-16 of the DEIS, demonstrates that 9,043 additional persons living off-base would be exposed to noise levels in excess of 65 dB DNL under JSF Flight Training Alternative 2. This is a 449 percent increase in persons exposed to noise levels in excess of 65 dB DNL under JSF Flight Training Alternative 2.

56.     In Valparaiso, several noise-sensitive facilities were specifically identified in the DEIS as part of the noise predictions. These noise-sensitive facilities are: (1) Lewis Middle School; (2) Valparaiso Elementary School; (3) the First Assembly of God;

(4) the New Hope Baptist Church; (5) the Sovereign Grace Church; (6) the Unitarian church; and (7) two areas of residential houses, which shall be referred to as "Housing 1" and "Housing 2." These noise-sensitive facilities are indentified on two map overlays, found on pages K-327 and K-328, and Table 1, found at K-325, in composite Exhibit "H," which is being filed under separate notice and is incorporated herein by reference.

57.     Lewis Middle School was predicted to experience 67 dB under JSF Flight Training Alternative 1 and 73 dB DNL under JSF Flight Training Alternative 2.

58.     The Valparaiso Elementary School, located just down the street from City Hall, was predicted to experience 75 dB under JSF Flight Training Alternative 1 and 80 dB DNL under JSF Flight Training Alternative 2.

59.     The First Assembly of God, which, like the Valparaiso Elementary School, is located just down the street from City Hall, was predicted to experience 79 dB under JSF Flight Training Alternative 1 and 83 dB DNL under JSF Flight Training Alternative 2.

60.     New Hope Baptist, located just across the street from City Hall, was predicted to experience 79 dB under JSF Flight Training Alternative 1 and 83 dB DNL under JSF Flight Training Alternative 2.

61.     The Sovereign Grace Church was predicted to experience 72 dB under JSF Flight Training Alternative 1 and 77 dB DNL under JSF Flight Training Alternative 2.

62.     The First Baptist Church was predicted to experience 70 dB under JSF Flight Training Alternative 1 and 75 dB DNL under JSF Flight Training Alternative 2.

63.     The Unitarian church was predicted to experience 78 dB under JSF Flight

Training Alternative 1 and 83 dB DNL under JSF Flight Training Alternative 2.

64.     Housing 1 was predicted to experience 78 dB under JSF Flight Training Alternative 1 and 83 dB DNL under JSF Flight Training Alternative 2.

65.     Housing 2 was predicted to experience 84 dB under JSF Flight Training Alternative 1 and 87 dB DNL under JSF Flight Training Alternative 2.

66.     These noise-sensitive facilities are not the only facilities that will be exposed to significant adverse noise impacts. Indeed, there are several daycare centers in Valparaiso that will be exposed to the excessive noise levels.

*Other issues of concern to the City in the DEIS*

67.     The DEIS notes, at page 7-57, that "[t]here is little to suggest that airspace modifications under the Proposed Action would impact land values in the affected area." The DEIS further suggests that the "complex nature of property valuation factors makes any estimation of the potential effects on airspace modifications on land values highly speculative." Simply stated, the USAF chose to give this issue short shrift and not address it in any detail, as is required under NEPA.

68.     The DEIS also addressed some safety issues (crashes and the carriage of live ordnance), as well as risks to children. The City expressed concerns about these matters, and the DEIS' discussion of same, as well. The City's concerns regarding the USAF's deficiencies in addressing these and other issues adequately will be addressed below.

Valparaiso's Comment on the Draft Environmental Impact Statement

69.     On May 9, 2008, the City of Valparaiso commented on the DEIS ("Valparaiso Comment"; hereinafter cited as *ValCom,* pg. # (referring to the page number

in the bottom left-hand corner of the page)). A copy of the Valparaiso Comment is being filed under separate notice and is incorporated herein by reference as Exhibit "I." In the Valparaiso Comment, the City explained that the "environmental consequences of high noise levels and flight safety over Valparaiso depicted in the BRAC 2005 EIS [the DEIS] are totally unacceptable and incompatible with our primarily residential city. It is also felt the EIS may be in violation of NEPA guidelines as it fails to adequately address the negative impacts of these two issues. The draft EIS also does not address reasonable alternatives believed required by NEPA." *ValCom*, pg. 1. Accordingly, the City put the USAF on notice at that time that the City believed the DEIS to be in violation of NEPA.

70.     The City went on to state that "[w]hen it became apparent that the two JSF Flight Training Alternatives would significantly impact Valparaiso to the point of destroying the city; (sic) it should have been obvious to Air Force planners, that at a minimum, a third alternative to adjust the runways, flight paths, take-offs, etc to remove the exceedingly high noise levels over our city was reasonable and necessary." *Id.*

71.     The Valparaiso Comment notes that there "are 1,800 homes, 120 businesses, 10 churches, 5 daycares and 2 public schools in Valparaiso. Over 6,400 residents live," *ValCom*, pg. 2, in Valparaiso. The City advised the USAF, in the Valparaiso Comment, that the City felt "it was unconscionable for Eglin AFB and the Department of Defense to continue to pursue either of the stated alternatives." *Id.*

72.     The City outlined the percentage of City area, using noise contours from a Joint Land Use Study, affected by noise levels by each individual JSF Flight Training Alternative. Under JSF Flight Training Alternative 1, the City concluded that only 7 percent of the City area remain below the 65 dB noise contour. Thirty four percent of the

City area would fall within 65 to 69 dB contours, with 23 percent falling between 70 to 74 dB contours, 12 percent falling between 75 to 79 dB contours, 10 percent falling between 80 to 84 dB contours, and 13 percent falling in the contours above 85 dB. For JSF Flight Training Alternative 2, zero percent fell below 65 dB contour, with 10 percent falling between 65 to 69 dB contours, 40 percent falling between 70 to 74 dB contours, 23 percent between 75 to 79 dB contours, 14 percent between 80 and 84 dB contours, and 13 percent above 85 dB contour.

73.    The City emphasized that the "EPA and the Air Force have both stated that levels above 65 dB are not suited for residential purposes." *ValCom*, pg. 1. The City further noted that "[t]he above numbers prove that living with either alternative is intolerable. Businesses will experience transaction difficulties and the two public schools cannot function with the excessive high noise. Valparaiso will be devastated and become a ghost town." *Id.*

74.    In addition to the City's concern over noise impacts, the City advised that "[t]he safety issue is also a great concern." *ValCom*, pg. 1. The City unequivocally stated that the "[D]EIS misrepresents the actual threat to public safety." *Id.* Indeed, the City believes "that the frequency of Class A mishaps will be greater than one per year since Eglin will be a training installation." *Id.*

75.    The City also expressed concerns regarding the "carriage of live ordinance over our heavily populated area . . . ." *Id.* Indeed, the City noted that the "[D]EIS tries to assure us that the Air Force has safety procedures in place to prevent inadvertent release of live ordnance, yet there is *no* data presented to support that assumption." *Id.* (emphasis supplied).

76.     The City took issue with the statement in the DEIS that "[t]here is little to suggest that airspace modifications under the Proposed Action would impact land values in the affected area." *ValCom*, pg. 4. The City disputed this statement, noting that this statement "completely ignores existing studies and Federal Law which prove otherwise. In addition, the author did not include FHA and VA mortgage financing guidelines that address properties in high noise levels." *Id.* The City pointed out that no "real estate professional specializing in appraisals," *id.*, is listed as contributing to the DEIS, and concluded that "[d]ue to the lack of professional expertise, the [D]EIS inadequately addresses reduction in property values." *Id.*

77.     Turning to the DEIS' treatment of special risks to children, the City states, in no uncertain terms, that the DEIS "grossly neglected the negative impact on children. The [D]EIS only informs of the special risks to children and does not address the mitigation," *ValCom*, pg. 7, of the risks. Citing the *FICAN Position on Research into Effects of Aircraft Noise on Classroom Learning*, September 2000 (a source cited in the DEIS, ironically), the City notes that "[r]esearch on the effects of aircraft noise on children's learning suggests that aircraft noise can interfere with learning in the following areas: reading, motivation, language and speech acquisition, and memory." *Id.*

78.     The City concluded that the risks to children in Valparaiso may result in the implementation of special programs "to give these children a fair opportunity to achieve academically the same as their peers." *Id.* Again, noting that there was no input from the appropriate professionals, namely a professional in "child development," the City concludes that more information should be prepared "to sufficiently address the negative impacts to children utilizing professional expertise in child development." *Id.*

79.    The City provided the Valparaiso Comment to the USAF, as part of the NEPA process, to advise the USAF decisionmakers regarding those issues that presented grave concern to the City. The USAF, however, chose to basically ignore the Valparaiso Comment.

The United States Environmental Protection Agency's Comment on the DEIS

80.    The EPA reviews environmental impact statements under NEPA. In this capacity, the EPA provided its review of the DEIS (hereinafter the "EPA Review"; page citations will be to the number in the bottom-left hand corner of the page). The EPA Review is being filed under separate notice and is incorporated herein by reference as Exhibit "J."

81.    The EPA noted in the EPA Review, at page 6, that the

noise environment both on-base and off-base is projected to increase significantly due to an increase in the level of operations and the introduction of the F-35 aircraft [the JSF], which is a much louder aircraft than the F-15 aircraft. Off-base populations subject to noise levels of 65 decibels (dB) day-night average sound level (DNL) or greater are estimated to increase from the baseline of 2,113 persons to 6,757 persons for JSF Flight Training Alternative 1 and 11,156 for Alternative 2. The estimated population affected by greater than 75 dB DNL would increase from the baseline of 142 to 2,174 persons for JSF Flight Training Alternative 1 and 2,721 for Alternative 2. The Draft EIS also identifies a number of noise sensitive land uses on-base and off-base (e.g., residences, hospital, schools, and child development centers) that will be exposed to incompatible noise levels. Under implementation of either JSF flight training alternative, special risks to children are anticipated in the form of increased difficulty in learning at several schools impacted by high noise levels. There are five schools in Okaloosa County School District that would be potentially affected by noise levels of 65 dB DNL and above, as well as four daycare centers.

82.    Finding that exposure to elevated noise levels caused by the operation of the JSF would be so great, the EPA recommended that the USAF purchase almost 1,000 homes, most if not all of which lie within the boundaries of the City, because they would

essentially be uninhabitable due to the noise impacts from the operation of the JSF. The EPA's statement firmly demonstrates that it is the Plaintiff's citizens and the Plaintiff's properties, employees and operations that will be most affected by the beddown of the JSF at Eglin Main Base.

83. The EPA also found that the JSF program would cause special risk to the children in schools and day care centers. To that end, the EPA noted that there are five schools in Okaloosa County. Two of these schools are in the City. There are also three day care centers located in the City which the EPA identified as being substantially affected by the noise impacts.

The USAF Legal Memorandum

84. The USAF's General Counsel's Office wrote a memorandum relating to the DEIS (hereinafter the "USAF Legal Memorandum"; cited to as the "USAF LM"). The USAF Legal Memorandum is dated July 30, 2008, and was authored by Doug Heady, Associate General Counsel, SAF/GCN, and L.H. Reed, Jr., Attorney-Advisor, AFLOA/JACE. The USAF Legal Memorandum was published in the *Northwest Florida Daily News* and the *Bay Beacon* newspapers, and was reported on WEAR, Channel 3 News, Pensacola, Florida, and maintained on the television station's website. The USAF has since acknowledged its validity. The USAF Legal Memorandum is being filed under separate notice and is incorporated herein by reference as Exhibit "K."

85. The USAF Legal Memorandum discusses the implementation of the Commission's Recommendation and the establishment of the IJTS, and the USAF's compliance, or lack thereof, with NEPA. The USAF Legal Memorandum concludes that "the Air Force's EIS for implementation of the BRAC '05 Commission decisions

26

affecting Eglin AFB need not address the selection of Eglin [Air Force Base] as an installation to receive the Joint Strike Fighter Initial Joint Training Site (JSF IFTS) or consider any alternative installation [other than Eglin Air Force Base] for the beddown and operation of the IJTS." *USAF LM*, pg. 1. However, the USAF Legal Memorandum concluded that "in all other respects NEPA and the Council for Environmental Quality's (CEQ's) implementing regulations fully apply. This means that the Department's discretionary decision-making regarding how to implement the BRAC requirements is subject to NEPA." *Id.* In other words, NEPA requires the USAF to consider all reasonable alternatives within the 724 square miles of Eglin Air Force Base. The USAF did not attempt to comply with that requirement in either its DEIS or FEIS.

86.     Proceeding with its analysis, the USAF Legal Memorandum notes that "in the case of Eglin AFB the BRAC language directing the standup of the IJTS was not very explicit, leaving quite a bit to our discretionary planning and decision-making." Accordingly, "[b]ased upon input from user groups associated with implementing the JSF IFTS at Eglin, as well as BRAC supporting documentation (E&T JCSG 2005), minimum requirements were used to evaluate siting options on Eglin Main Base." *Id.* The USAF Legal Memorandum further notes that to "date this discretionary planning has resulted in two proposed cantonment areas for bedding down the IJTS - both within the area of Eglin Main Base (33rd Fighter Wing and 46th Test Wing Areas) - and two flight training alternatives." *Id.*

87.     Noting the deficiencies in the USAF's analysis in its DEIS, the USAF Legal Memorandum, states that:

> Additional beddown/operational alternatives were briefly considered in 2006, but were rejected without detailed analysis apparently on the

grounds of not meeting the intent of BRAC's goals and objectives, such as costs, using an existing infrastructure, and reducing excess capacity. However, given a number of factors - our discretion to interpret what the BRAC Commission meant; lack of noise analysis in support of the BRAC Commission decision and recognition that such analysis would need to be conducted; the size of the Eglin Reservation (724 sq. mi.); and the serious community noise impacts (both on- and off-base) from either operational alternative - *reasonable minds could disagree regarding whether the range of alternatives in our EIS is broad enough to meet the requirements of NEPA.*

*USAF LM*, pg. 2 (emphasis supplied).

88.    Reasoning that the USAF has compelling arguments to support its decision, mostly that the beddown of the JSF was required to be at Eglin Main Base under the BRAC Act and Commission's Recommendation, the USAF Legal Memorandum nonetheless notes that "plaintiffs will have similarly compelling arguments, *if not more so*, that our process was flawed." *Id.* (emphasis supplied).

89.    In addition to the failure to analyze all reasonable alternatives, the USAF Legal Memorandum notes that "[o]ther issues that could be raised that we know of include the adequacy of our noise data (lack of production model data; lack of STOVL data) and the adequacy of the impacts from operations in the existing air space and any additional required airspace . . . ." *Id.* at pgs. 2-3. Addressing the lack of noise data, in footnote 1, the USAF Legal Memorandum states that "[n]oise data is predominantly a JSF program issue at this point. In developing the JSF aircraft, the JSF program office has known about the potential for significant near-field and far-field noise impacts for some time . . . ." *Id.* at pg. 3.

90.    In pressing forward to beddown 59 JSF aircraft at Eglin Main Base, the USAF has flouted NEPA, ignored the concerns of the City as expressed in the Valparaiso

Comment, ignored the concerns of the EPA as expressed in the EPA Review, and ignored the concerns of its own service members as expressed in the USAF Legal Memorandum.

<u>The Environmental Assessment for the Base Exchange</u>

91.    In September of 2008, the USAF issued an Environmental Assessment Addressing an Army and Air Force Exchange Service (AAFES) Lifestyle Center at Eglin Air Force Base, Florida ("EA").[8]  The EA reveals that AAFES "proposes to construct a Lifestyle Center at Eglin AFB." *EA*, pg. 2.  "The Lifestyle Center would be composed of two key facilities, one at each end of the development." *Id.*  The plans "position the main BX [base exchange – military jargon for a retail store] at one end of the Lifestyle Center, and another establishment, such as a first-run movie theater, at the other end." *Id.*  "Two alternative sites were considered and eliminated from further analysis." *Id.*  "One alternative eliminated from analysis was to construct the Lifestyle Center on a site adjacent to the north side of the West Gate . . . because of future noise conflicts due to the anticipate arrival of the Joint Strike Fighter (JSF) aircraft." *Id.* at 2-3.

92.    This eliminated alternative location for the Lifestyle Center fell between the 70 and 75 dB noise contour.  Stated otherwise, the Lifestyle Center would be exposed to noise levels somewhere between 70 dB and 75 dB if constructed on the eliminated alternative location.  The USAF determined that these levels were too noisy for shopping and theater-going.  Succinctly put, the USAF does not believe that its service members should be exposed to these noise levels during these activities.  Yet, the USAF's decision to beddown the JSF at Eglin Main Base will cause thousands of the City's residents and employees, as well as the operations of the City, to be exposed to noise in excess of 70

---

[8] The pertinent pages of the EA are filed under separate notice and incorporated herein by reference as Exhibit "L."

dB. It appears that USAF is not applying the same "measuring stick" when measuring the damage to the USAF's service members from noise levels in excess of 70 dB against the impact of identical or greater noise levels on the City's residents, employees and property that they will experience as a result of the operation of the JSF out of Eglin Main Base.

Final Environmental Impact Statement

93.     In December of 2008, the USAF issued its FEIS. The FEIS did nothing to address the issues raised in the EPA Review, the Valparaiso Comment, or the USAF Legal Memorandum. Instead, the USAF continued to focus solely on Eglin Main Base as the only location for bedding down the JSF. The FEIS ignores all other reasonable alternatives to Eglin Main Base for the beddown of the JSF. In doing so, the FEIS became a vehicle for the USAF to justify a decision - to beddown the JSF at Eglin Main Base - the USAF had already made prior to the issuing the DEIS.

*Take-offs, landings and operations*

94.     The FEIS outlines two alternative cantonment areas within Eglin Main Base for the IJTS and two proposed flight training alternatives, again JSF Flight Training Alternative 1 and JSF Flight Training Alternative 2. These flight training alternatives were the same two flight training alternatives discussed in the DEIS.

95.     JSF Flight Training Alternative 1 was identified as the preferred alternative. Under JSF Flight Training Alternative 1, "51 percent of the total proposed JSF airfield operations will take place at Eglin Main Base and 35 percent will take place at Duke Field. The remaining 14 percent of airfield operations will take place at Choctaw Field." *FEIS*, pg. 7-13.

30

96.     The FEIS uses the year 2005 as its "Baseline" in comparing annual airfield operations with JSF Flight Training Alternatives 1 and 2 for the JSF. An operation, as that term is used in the FEIS, is essentially a take-off or a landing or a "touch-and-go." The FEIS states that "the number of operations is the number of times one aircraft crosses the end of one runway and is used as input for environmental analysis." *FEIS, Exec. Summary*, Pg. ES-30. Table 2-23 of the FEIS, at page 2-84, states that with regard to annual airfield operations at Eglin Main Base for the baseline year of 2005, the F-15s of the 33rd Fighter Wing conducted 29,206 operations. For the same baseline year 2005, other aircraft conducted 76,582 operations at Eglin Main Base. Thus, for the baseline year of 2005, Table 2-23 of the FEIS states that there were a total of 105,788 operations at Eglin Main Base.

97.     Table 2-23, at page 2-84, in the FEIS notes that for what the Air Force calls "Alternative 1," the preferred beddown location within Eglin Main Base, the 107 JSF aircraft will engage in 121,286 annual airfield operations. Other aircraft types will engage in 74,253 annual air field operations. Thus, the FEIS finds that with the chosen beddown site on Eglin Main Base, there will be total of 195,539 air field operations at Eglin Main Base.

98.     This represents an increase in total airfield operations, all attributable to the JSF, of 85%. The F-15s of the 33rd Fighter Wing will no longer be at Eglin Main Base after the arrival of the JSF. The 29,206 annual air field operations of the F-15 will be replaced by 121,286 annual air field operations at Eglin Main Base by the JSF. There will be over four times as many annual air field operations by the JSF than have presently been conducted by the F-15 which will be displaced by the JSF. That is essentially

92,000 additional takeoffs and landings, combining to generate significantly more noise than has previously been experienced by the citizens of Valparaiso. That is a profound impact by itself and becomes truly extraordinary when coupled with the findings in the FEIS that in the takeoff and departure phase, the JSF is twice as noisy as the F-15 and in the approach and landing phase, the JSF is four times as noisy as the F-15.

99.     In total, the FEIS proposed 239,875 JSF flight training operations out of Eglin Air Force Base, with 121,286 operations at Eglin Main Base, 84,956 JSF operations at Duke Field and 33,633 operations at Choctaw Field.

*Noise from the JSF*

100.    The FEIS continued to warn that "[a]t military takeoff power, noise from the F-35 is about 9 dB higher (twice as loud) than the F-15C at military takeoff power." *FEIS*, pg. E-21. Moreover, as noted in the FEIS, "[d]uring approach, noise from the F-35 is about 19 dB higher than noise from an F-15C. This corresponds to the F-35 being about four times as loud as the F-15C." *Id.*. Simply put, nothing changed between the DEIS and FEIS to address the City's initial concerns regarding the noise from the JSF.

101.    Composite Exhibit "M," filed under separate notice and incorporated herein by reference, is the USAF noise contours for calendar year 2016, presented in visual form, from the FEIS. These contours result from the modeling efforts of the USAF with regard to the 107 JSF aircraft and demonstrate the severe impact to Valparaiso, as the contours envelope the City, with levels reaching above 85 dB DNL.

*Persons affected/incompatible land uses*

102.    Again, the FEIS, like the DEIS, noted that thousands of persons living off-base, including, but not limited to, residents of Valparaiso, would be negatively affected

by noise. Like the DEIS before it, the FEIS noted that several noise -sensitive facilities would experience severe noise.

103. The FEIS contains the same Table 7-3 contained in the DEIS. Per the FEIS, Table 7-3, page 7-6, 2,113 people living off-base are currently exposed to sound levels in excess of 65 dB DNL. However, under JSF Flight Training Alternative 1 significantly more people living off-base will be exposed to increased noise levels from operations of the JSF out of Eglin Main Base and Duke Field. Indeed, according to Table 7-9 of the FEIS, 1,921 additional people living off-base would be exposed to noise levels between 65 to 70 dB DNL from such operations. Furthermore, an additional 691 people living off-base would be exposed to 70 to 75 dB DNL, an additional 664 people would be exposed to 75 to 80 dB DNL, 644 additional people would be exposed to 80 to 85 dB DNL, and an additional 724 people would be exposed to sound levels in excess of 85 dB DNL. Altogether, an additional 4,644 people living off-base will be exposed to sound levels in excess of 65 db DNL. In total, under JSF Flight Training Alternative No. 1, 6,757 people would be exposed to noise in excess of 65 dB DNL, which is an approximate 319 percent increase in off-base persons exposed to noise levels in excess of 65 dB DNL.

104. The same noise-sensitive facilities were identified as part of the noise predictions. Again, these noise-sensitive facilities are: (1) Valparaiso Elementary School; (2) the First Assembly of God; (3) the New Hope Baptist Church; (4) the Sovereign Grace Church; (5) the Unitarian church; (6) two areas of residential house, which shall be referred to as "Housing 1" and "Housing 2." This time, without explanation, the numbers were slightly different than as earlier predicted in the DEIS. In all but one instance, the

noise got much worse than was predicted under Alternative 1 in the DEIS.

105. Lewis Middle School is predicted to experience 68 dB under JSF Flight Training Alternative 1 and 73 dB DNL under JSF Flight Training Alternative 2.

106. The Valparaiso Elementary School, which is located just down the street from City Hall, is predicted to experience 79 dB under JSF Flight Training Alternative 1 and 80 dB DNL under JSF Flight Training Alternative 2. As noted above, the DEIS predicted that Valparaiso Elementary School would experience noise levels in excess of 75 dB, which is significant. However, now under JSF Flight Training Alternative 1, the school's predicted exposure to 79 dB effectively renders this school incompatible with the provision of educational services. Indeed, the FEIS expressly notes that "[n]oise levels of 75 dB DNL and above are not considered compatible with educational services." *FEIS*, pg. 7-65. While the DEIS's prediction of 75 dB fell within this unacceptable range, the FEIS's prediction of even higher noise levels essentially guarantees the closing and/or relocation of this elementary school if it is to continue to provide educational services.

107. The First Assembly of God, which, like the Valparaiso Elementary School is located just down the street from City Hall, is predicted to experience 83 dB under JSF Flight Training Alternative 1 and 83 dB DNL under JSF Flight Training Alternative 2.

108. New Hope Baptist, which resides just across the street from City Hall, is predicted to experience 83 dB under JSF Flight Training Alternative 1 and 83 dB DNL under JSF Flight Training Alternative 2.

109. The Sovereign Grace Church is predicted to experience 76 dB under JSF Flight Training Alternative 1 and 77 dB DNL under JSF Flight Training Alternative 2.

110. The First Baptist Church is predicted to experience 73 dB under JSF Flight

Training Alternative 1 and 75 dB DNL under JSF Flight Training Alternative 2.

111.    The Unitarian church is predicted to experience 68 dB under JSF Flight Training Alternative 1 and 71 dB DNL under JSF Flight Training Alternative 2.

112.    Housing 1, one of two general areas or residential houses referenced in the ROD, is predicted to experience 82 dB under JSF Flight Training Alternative 1 and 83 dB DNL under JSF Flight Training Alternative 2.

113.    Housing 2, the other area of residential houses referenced in the ROD, is predicted to experience 88 dB under JSF Flight Training Alternative 1 and 87 dB DNL under JSF Flight Training Alternative 2.

114.    In addition to identifying noise-sensitive facilities, the FEIS, at pages E-13 and E-14, in Table E-5, outlines land use compatibility with annual DNLs, Day-Night Average Sound Levels. For instance, according to Table E-5, no residential use, whether that be standard homes, mobiles homes, or transient lodges, are considered compatible with noise levels in excess of 65 dB DNL.

115.    Schools are not considered compatible with noise levels in excess of 65 dB DNL. However, "where the community determines that . . . school uses must be allowed, measures to achieve outdoor-to-indoor NLR [noise level reduction] of at least 25 dB to 30 dB should be incorporated into building codes . . . ." *FEIS*, pg. E-14, FN 1. In the case of Lewis Middle School and Valparaiso Elementary School, these buildings have already been constructed and would have to be renovated to include sound-dampening measures within the physical structures.

116.    Hospitals, nursing homes, churches, auditoriums, and concert halls are also not considered compatible with noise levels in excess of 65 dB DNL, unless there is

some noise attenuation measures taken with regard to the actual structure. Even then, noise levels in excess of 75 dB DNL are considered incompatible with these land uses even with noise attenuation measures.

117. Offices and general retail stores are not considered compatible with noise levels in excess of 70 dB DNL, unless there is some noise attenuation measures taken with regard to the actual structures. However, noise levels in excess of 80 dB DNL are considered incompatible with these land uses even with noise attenuation measures.

118. As noted above, Lewis Middle School is predicted to experience noise levels in excess of 68 dB DNL. Valparaiso Elementary School is predicted to experience noise levels in excess of 79 dB DNL. Furthermore, Valparaiso contains several offices, including the City Hall, which will be exposed to noise levels generated by JSF flight training operations out of Eglin Main Base in excess of 70 dB DNL. There is also a hospital in neighboring Niceville that will be greatly affected by the noise of the JSF.

119. Mitigation of these impacts, including the cost, who should pay for it, and with regard to the schools how it should be accomplished while still allowing the schools to provide educational services, is something that is not addressed in the FEIS.

*Modeling Efforts Revealed*

120. Appendix K of the FEIS described five scenarios that the USAF modeled for noise impacts. All five of these scenarios assumed that the 107 JSF aircraft would be bedded down at Eglin Main Base. The five scenarios were completed on or before the following dates: July 31, 2007 (Scenario One or "Duke Heavy"), December 21, 2007 (Scenario Two or "Choctaw Heavy"), December 12, 2007 (Scenario Three or "Eglin Heavy"), and November 27, 2007 (Scenario Four or "Optional Mix"), and February 13,

36

2008 (Scenario Five). Scenario Five became JSF Flight Training Alternative 1, and Eglin

Heavy became JSF Flight Training Alternative 2, as those terms are used in the DEIS,

FEIS, and this pleading.

121. "Simultaneous with the noise modeling [of the first four scenarios], flight

operations were being run through a Naval Aviation Simulation Model (NASMOD) to

determine whether there would be airspace conflicts." *FEIS*, pg. K-2. After the first four

scenarios were modeled using NASMOD, it was determined that Eglin Heavy had the

"greatest chance of being operationally feasible . . . ." *Id.* "A fifth attempt [JSF Flight

Alternative 1] was made using NASMOD to develop an operational scenario that

minimized noise on the local communities and was still operationally feasible." *FEIS*, pg.

K-3. However, this fifth attempt, JSF Flight Training Alternative 1, "showed the

Valparaiso area would be significantly impacted by noise by CY 2016 when the IJTS

would be operating at full capacity." *Id.*

122. Regarding JSF Flight Training Alternative 1, the USAF noise modeling

assumed very constraining operational limitations. For instance, for JSF Flight Training

Alternative 1 the USAF modeling effort assumed that 85 percent of all initial takeoffs

were south flow (Runways 19 and 12). The remaining 15 percent were north flow

(Runways 01 and 30). "On south flow, 95 percent of initial takeoffs were modeled on

Runway 12 (80.75 percent of all takeoffs) and the remaining 5 percent on Runway 19

(4.25 percent of all takeoffs)." *FEIS*, pg. K-331. As for north flow, "initial takeoffs were

modeled equally for Runway 01 (7.5 percent of all takeoffs) and Runway 30 (7.5 percent

of all takeoffs)." *Id.* The purpose here, as is apparent, was to decrease noise in

Valparaiso by directing operations away from Runway 01/19. Yet, even with these

constraints - directing most flights away from Runway 01/19 (the closest runway to Valparaiso) - the noise impacts are still prohibitive.

123. Further demonstrating the efforts of the USAF to create the *appearance* of minimized noise impacts on Valparaiso, Table 3-1 provides a summary of modeling assumptions with regard to specific types of takeoffs and landing. For the USAF modeling efforts on JSF Flight Training Alternative 1, 80.75% of afterburner departures were projected on Runway 12. Likewise, for military departures, 80.75% were projected on Runway 12. These modeling assumptions, for JSF Flight Training Alternative 1 may have helped create the *appearance* of a minimization of noise on the local community. If these assumptions/conditions are removed, as they have been by the ROD, the predicted noise impacts, which are severe, will be understated with respect to noise impacts on Valparaiso. Exhibit "N," filed under separate notice and incorporated herein by reference, is Table 3-1 from Appendix K of the FEIS.

*The USAF's modeling efforts are flawed*

124. The USAF's noise modeling, in the FEIS (and, hence, the ROD based on it) is especially uncertain, however, due to the very limited and poorly documented information available about JSF noise emissions and operational plans for the JSF aircraft to be bedded down at Eglin Main Base under the ROD. For example, page E-21 of Appendix E of the FEIS notes that "noise levels for the *pre-production* F-35A aircraft were measured *for limited conditions* by Lockheed-Martin during initial testing in 2001 and then re-measured by the U.S. Air Force in 2007. The Air Force Research Laboratory ("AFRL") incorporated the 2007 data into the NOISEFILE database, which was then used as the source for noise analysis in this document" (emphasis supplied). The noise

exposure projections of the FEIS are independent of any further information that may have been derived from subsequent measurements.

125. The only engine available for the JSF in 2007 was the Pratt & Whitney F-135 (a variant of the F-22's F119 engine core, composed of a 3-stage fan, 5-stage compressor, a 3-stage low-pressure turbine section and a single stage high-pressure turbine). The first three production lots of approximately 75 aircraft will be equipped with this engine. Later JSF aircraft, including the STOVL with its lift fans, however, may be powered by a different engine (GE/Rolls Royce F136), which remains under development. The F136 engine consists of a 3-stage fan, 5-stage compressor, a 3-stage low-pressure turbine section and a single stage high-pressure turbine.

126. Since even minor differences in jet engine exhaust gas velocity and annulus diameter can disproportionately affect engine noise emissions, and since no measurements are provided at all for lift fan noise, it is unlikely that either Lockheed-Martin or AFRL has comprehensive and reliable noise level measurements for the 59 JSF aircraft that the USAF has bedded down at Eglin Main Base under the ROD and the 48 additional JSF aircraft the USAF proposes to bring to Eglin Air Force Base. For example, page K-70 of Appendix K of the FEIS describes the locations of two, 250' square VTOL pads. It is unclear from the information provided in the FEIS whether *any* modeling of F-35 lift fan noise was attempted in NOISEMAP, or if so, what information was available to support necessary noise modeling assumptions.

127. Further, the training syllabus for the JSF has not been finalized, so little confidence can be placed in guesses made in the USAF's noise modeling about numbers and types of operations that may someday be routinely flown by Air Force, Marine

Corps, and/or Navy versions of the aircraft.

*The USAF's scientific resources are outdated*

128. NEPA requires that agencies use the best available technology. In its FEIS, the USAF repeatedly cites to outdated sources to support its conclusions with regard to noise impacts from the JSF. In this regard, the FEIS violates NEPA.

129. The Air Force overlooks the annoyance of indoor secondary emissions (rattling sounds produced by household paraphernalia) produced by low-frequency noise exposure from ground operations such as start of takeoff roll and engine maintenance run-ups, as well as low-frequency noise produced by STOVL operations and afterburner use.

130. The ROD and FEIS fail to acknowledge the full extent of the egregiously high single event noise levels created by overflights of Valparaiso. Noise levels created by individual JSF overflights of Valparaiso will not be merely "twice as loud" as those created by the JSF, they will also create noise levels that are likely to be perceived as painfully loud by all persons in Valparaiso during such an event (i.e. tourists, residents and City employees). The issue is not simply that residential land uses at high cumulative noise exposure levels are likely to be "incompatible" for official policy purposes with such overflights, but that overflown areas are likely to be effectively uninhabitable.

*The USAF models noise impact for 42 JSF aircraft*

131. In addition to modeling the noise impact of 107 JSF aircraft, the USAF modeled noise impacts for of both Alternatives 1 and 2 in the year 2013 assuming 42 JSF aircraft. In its projections, the USAF projects that 42 JSF aircraft will be in place

and operating at Eglin Main Base as part of the IJTS. For some reason, the USAF apparently determined that it would be beneficial to the public to understand that the noise contours would increase over time, and that the full impact of the JSF would not be realized until the entire complement of aircraft had arrived and were operating at Eglin Main Base. In other words, the USAF stated the obvious in its approximation of Alternatives 1 and 2. The modeling results for the 42 JSF aircraft are presented in visual form in Composite Exhibit "O," which is being filed under separate notice and is incorporated herein by reference.

132.    This modeling of only forty-two (42) JSF aircraft incorporated the same modeling assumptions, discussed above, used by the USAF in modeling the noise of 107 JSF aircraft. Importantly, the USAF noise modeling shows that even 42 JSF aircraft will have a profoundly negative impact on the City only slightly less damaging than the 107 JSF aircraft.

133.    While the USAF modeled the noise impacts from 42 JSF aircraft, the FEIS contains no modeling analysis, or noise impact predictions, for 59 JSF aircraft. The first time that 59 JSF aircraft are discussed in a USAF document is in the ROD.

*The failure to consider reasonable alternatives addressing or mitigating the threat associated with the carriage of live ordnance, threat of mishap, devaluation of property, and special risks to children*

134.    The JSF aircraft will carry live ordnance and conduct live fire exercises on Eglin Air Force Base. The JSF aircraft will "use ordnance, such as laser- and Global Positioning System (GPS)-guided bomb units (GBUs), 25-millimeter (mm) ammunition for strafing, and defensive flares." *FEIS*, pg. ES-31. The annual ordnance requirements for JSF training operations are 635 live GBUs, 219 inert GBUs, 208,518 25-mm, and

1,363 flares.

135.	The FEIS admits that "it is impossible to state categorically that an accidental release of ordnance could never occur." *FEIS*, pg. 7-93. However, relying on "safety risk analyses" the USAF argues that "accidental releases that could have serious consequences is so small that it can be essentially discounted." *Id.* The USAF overlooks the fact that the JSF is a new aircraft and that the pilots training at the IJTS will be new to the JSF. Accordingly, the USAF should have considered other alternatives than using Eglin Main Base for the beddown of the JSF.

136.	The FEIS predicted the mishap (accident) rate for the JSF by using mishap rates of other aircraft. These mishap rates appear to be based on data collected from the mature operational fleet of each aircraft used as the basis for the USAF's conclusions with regard to JSF mishap rates. The CVOL, Conventional Take-Off and Landing, and CV, Carrier Variant, were assumed to have similar mishap rates as the F-16. The STOVL was assumed to have a similar mishap rate as the Harrier Jet. These assumptions fail to recognize that the IJTS will provide initial training for JSF pilots, who, at least initially, will be flying a new aircraft. Eglin Air Force Base is, due to the sheer number of JSF training operations, becoming a training installation. Accordingly, the USAF should have looked at mishap rates at training installations.

137.	The FEIS continued to stand by its statement that "[t]here is little to suggest that airspace modifications under the Proposed Action would impact land values in the affected area." *FEIS*, pg. 7-65. Notwithstanding the City's well-placed criticism, including citing to authority to support its concerns and noting the lack of appropriate professionals, the FEIS ignores the real potential for devaluation of property in and

around Valparaiso.

138.    Like the DEIS before it, the FEIS continued to warn about special risks to children.  Indeed, the FEIS concluded that "special risks to children are anticipated in the form of increased difficulty in learning at several schools impacted by high noise levels." *FEIS*, pg. 7-69.  As noted above, Lewis Middle School is predicted to experience 68 dB under JSF Flight Training Alternative 1 and Valparaiso Elementary School is predicted to experience 79 dB under JSF Flight Training Alternative 1.  By all accounts, the children in these schools can anticipate increased difficulty in learning while at school due to the high noise levels.  That having been said, the FEIS offers no mitigation plans that would act to reduce these special risks to children in Valparaiso, neither are any reasonable alternatives suggested, such as bedding down the JSF somewhere other than Eglin Main Base, that would avoid these special risks to children.

*The USAF acknowledges deficiencies in analysis*

139.    In a section of 7.3.5.1 of the FEIS, titled *BRAC Implementation*, the USAF acknowledges that the "adverse noise levels associated with establishing the JSF IJTS [Initial Joint Training Site] at Eglin Main Base raises the possibility of re-evaluating the proposed BRAC implementation strategy in order to reduce noise impacts.  An example of an alternative implementation strategy would be the evaluation of use, modification, upgrade, or new development and additional military and civilian airfields. . . ." *FEIS*, pg. 7-38.  In other words, the USAF acknowledged that reasonable alternatives exist, including, but not limited to, developing new airfields.  However, the FEIS does not consider any of those alternatives, as required by NEPA.

140.    The noise impacts from the JSF will, according to the EPA and FEIS,

result in significant harm to the residents of Valparaiso and the City's employees and operations as a whole. Almost every property owner throughout the City (including the City), will suffer noise levels in excess of 65 dB DNL. City Hall, which is located just across the street from the First Baptist Church, can expect to experience noise levels in excess of 73 dB DNL.

141.    Many of the City's property owners will experience noise levels so loud that their homes will be rendered uninhabitable. These people will likely look to relocate to better, less noisy living conditions. Some property owners may not be able to sell their homes for myriad reasons, including, but not limited to, poor economic times or the noise of the JSF. For those that cannot find alternative living conditions, they will forced to remain in their homes and potentially suffer the significant health consequences (e.g. high blood pressure, coronary disease, ulcers, colitis, and migraine headaches) that have been associated with extended exposure to extremely high noise levels like those that will be created by the JSF training operations at Eglin Main Base.

142.    This decision to beddown the JSF at Eglin Main Base will have significant negative impacts on the Plaintiff's citizens, Plaintiff's properties, Plaintiff's employees and the operation of Plaintiff as a whole. In the face of these consequences, which have been known to the USAF for quite some time by its own admission, the USAF is instead pressing forward with the beddown of 59 JSF aircraft at Eglin Main Base, in the absence of any reasoned or considered analysis of alternatives other than the use of Eglin Main Base.

<u>The USAF Record of Decision - the ROD</u>

143.    On February 5, 2009, Kathleen I. Ferguson, Deputy Assistant Secretary of

the Air Force, signed the ROD. The ROD orders the implementation of a portion of JSF Flight Training Alternative 1, the beddown of 59 JSF aircraft at Eglin Main Base, and the associated cantonment construction. The ROD also purportedly places temporary "limitations" on JSF flight training operations.

144. The ROD provides no analysis or noise modeling of the impacts of 59 JSF aircraft to support the USAF's decision to beddown 59 JSF aircraft at Eglin Main Base. Neither the DEIS or FEIS ever discussed the beddown of 59 JSF aircraft. In this regard, the USAF has arbitrarily and capriciously decided to beddown a number of aircraft that has not been individually subjected to any environmental analysis whatsoever.

145. The ROD determined that the decision regarding additional aircraft, namely the additional 48 aircraft, would be deferred until the completion of a Supplemental Environmental Impact Statement ("SEIS"). The ROD "anticipates" that the SEIS will be completed by September, 2010.

*Temporary Limitations*

146. According to the ROD, the "number, type, and location of operations for the full 59 [JSF] aircraft will be addressed in the SEIS which is expected to be completed in approximately September 2010." *ROD*, pg. 2. However, "[d]ue to the potential noise impacts both on and off Eglin AFB that the Air Force desires to consider more fully, there will be temporary operational limitations imposed on JSF Flight Training Activities to avoid and minimize noise impacts. These limitations will remain in place until the SEIS has been concluded and the Air Force has decided how best to proceed." *Id.*

147. Notwithstanding the foregoing, the ROD also notes that "[t]hese limitations are not, however, practical for use on a long-term basis. Ultimately,

cancellation or modification of these limitations will be required to accommodate the 59 [JSF] beddown as well as potential beddown of up to 107 [JSF] should that decision be made. Where the maximum supportable numbers of F-35 aircraft may ultimately bed down on the Eglin Reservation, how they might be operated, and the degree to which other mitigations are possible are all subjects to be addressed in the forthcoming SEIS." *Id.*

148.  The ROD alleges that "[t]o reduce noise impacts over the City of Valparaiso in the near term, Run Way (RW) 12/30 will be the primary Run Way for JSF operations at Eglin Main Base." *ROD*, pg. 3. The ROD goes on to note that "[l]imited F-35 operations will be allowed from RW 19 which, other than take offs, includes only those flight operations necessary for emergencies, unplanned contingencies, and weather affecting aircraft performance, limitations, and requirements." *Id.* Furthermore, "[l]imited F-35 operations will be allowed from RW 01, which other than approaches and landings, includes only those flight operations necessary for emergencies, unplanned contingencies, and weather affecting air craft performance limitations and requirements." *Id.* In other words, the USAF may use RW 19 for take offs and RW 01 for landings.

149.  The vague and generalized "temporary limitations" imposed on the JSF by the ROD are insufficient to satisfy NEPA or address the City's concerns. Indeed, when comparing these temporary limitations with the modeling assumptions used by the USAF in the USAF's noise modeling, it becomes evident that these "temporary limitations" in the ROD are less restrictive than the assumed constraints imposed upon flight training operations in the USAF noise modeling outlined above.

150.  For example, as noted above, the USAF modeling assumed that 85 percent

of all initial takeoffs were south flow (runways 19 and 12). The remaining 15 percent were north flow (runways 01 and 30). "On south flow, 95 percent of initial takeoffs were modeled on Runway 12 (80.75 percent of all takeoffs) and the remaining 5 percent on Runway 19 (4.25 percent of all takeoffs)." As for north flow, "initial takeoffs were modeled equally for Runway 01 (7.5 percent of all takeoffs) and Runway 30 (7.5 percent of all takeoffs)."

151. These assumptions are favorable to the USAF's modeling because the main residential and business area of Valparaiso is located immediately north of the approach end of Runway 19. Accordingly, limiting takeoffs from Runway 19 will act to reduce noise, assuming the limitation acts to reduce a defined number of takeoffs. For instance, the modeling assumptions that a large percentage of southerly takeoffs would be from Runway 12 acts to reduce noise impacts on Valparaiso more so than assuming an equal division of southerly takeoffs between Runway 19 and 12. However, the express language of the ROD allows unlimited takeoffs from Runway 19. Unlimited takeoffs of the JSF from Runway 19 will result in greater noise impacts to Valparaiso than those predicted by the USAF's modeling efforts, because the modeling efforts assumed a specified low percentage of takeoffs from Runway 19. In other words, these temporary "limitations" may very well result in more severe impacts to Valparaiso than those predicted by the USAF in its modeling.

152. The USAF is attempting to circumvent NEPA by prematurely bedding down 59 JSF aircraft at Eglin Main Base and allowing operations, even with the ROD's temporary "limitations." The USAF admits in the ROD what it only hinted at in the FEIS modeling efforts. These temporary limitations (and, similarly, modeling constraints) are

not practical for "real world" flight training operations. The FEIS does admit that, "[a]fter running all four noise scenarios [the first four] through NASMOD, the 'Eglin Heavy' scenario had the greatest chance of being operationally feasible based on airspace constraints and operational capacity . . . ." *FEIS*, pg. K-2. Simply put, the planned JSF flight training operations may not work when assuming the modeling constraints discussed above.

153. As a consequence, this decision to beddown the JSF at Eglin Main Base and allow operations of the JSF in a manner and number that has not been considered through the use of appropriate modeling is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law.

154. In addition to placing these temporary "limitations," the ROD notes that "operations and mitigations for the aircraft being bedded down in this ROD is further limited as a practical matter by the unavailability of aircraft in the early years. . . ." *ROD*, pg. 2. This is sophistry. Whether there are a limited number of JSF aircraft operating out of Eglin Main Base prior to the SEIS is irrelevant to the matter at hand. The crucial issue here is the USAF's failure to adhere to NEPA in deciding to beddown 59 JSF aircraft at Eglin Main Base, as well as begin the construction of the facilities for the IJTS, pursuant to the ROD.

*The ROD pleads the USAF guilty of violating NEPA*

155. The ROD requires that the "SEIS will be prepared to analyze the operational alternatives and mitigations for the full operational capability of the 59 [JSF aircraft] authorized to be delivered to Eglin under this ROD." *ROD*, pg. 3. "The number,

type, and location of operations for the full 59 [JSF aircraft] will be addressed in the SEIS . . . ." *ROD*, pg. 2. The ROD further requires that the "SEIS will analyze the proposed beddown and operational alternatives for the additional 48 [JSF aircraft] not authorized for delivery under this ROD. . . . Also, the range of reasonable alternatives analyzed in detail may consider an alternative that in some way adjusts or displaces existing mission(s)." *Id.* Most notably, the ROD unequivocally requires that the "SEIS will expressly consider whether either new parallel runways, as suggested by several commenters during scoping and in comments on the DEIS, should be carried forward for detailed analysis."

156. The ROD bedding down 59 JSF aircraft at Eglin Main Base also allows the construction of facilities to support these aircraft and the school operations. This construction involves the expenditure of $160,180,000.00 dollars for related infrastructure on Eglin Main Base to stand up the JSF IJTS. This expenditure will, in reality, act to preclude the USAF from properly considering a reasonable range of alternatives in the SEIS and mitigates against the USAF choosing any beddown location for the JSF aircraft other than Eglin Main Base, in violation of NEPA's full disclosure requirements and prohibition against using environmental impact statements to justify action already taken and/or decisions already made. This beddown of the JSF at Eglin Main Base is an end-around NEPA, and the USAF has frankly admitted as much through the foregoing language from the ROD.

<u>Additional general allegations</u>

157. The USAF's final decision, bedding down 59 JSF aircraft and constructing the associated facilities, will have a profound, negative impact on the citizens of

Valparaiso, and the City's properties, employees and operations of the City as a whole. The increased noise from the JSF will be heard throughout the entire City, causing significant negative impacts. The residents of Valparaiso and the City's properties, employees and operations will all be exposed to increased noise, and the associated health risks.

158. In addition to the environment impacts experienced by the City, affecting its properties, employees and operations, the City will suffer significant financial harm due to final decision of the USAF. The USAF's noise modeling of 42 JSF aircraft shows that the operation of the 42 JSF aircraft would probably render hundreds of homes in the City uninhabitable or greatly reduced in their value. The operation of 59 JSF aircraft out of Eglin Main Base will have even greater negative impact on Valparaiso citizens, the City's properties, employees, and operations, than 42 JSF aircraft. This could precipitate an exodus from the City that would reduce the City's tax rolls to the point where the City will likely not be able to meet its future debt obligations. At that point, the City's financial viability may be jeopardized to a point beyond repair, forcing the financial collapse of Valparaiso.

159. The City's responsibilities require it to preserve the rights and protect the safety, health and general welfare of its almost 6,400 citizens. Both the USAF and the EPA have expressly stated that the beddown and operation of the JSF at Eglin Main Base AFB will cause significant and damaging impacts both on-base and off-base. The City and its citizens find themselves in this situation through no act or fault of their own. Rather, the USAF, through the ROD, has proposed to severely and negatively impact thousands of American citizens residing in Valparaiso.

160.    The USAF has failed to take the requisite hard look at a reasonable range of alternatives prior to issuing its final decision. In doing so, the USAF has violated NEPA, NEPA's governing regulations, including the USAF's own regulations implementing NEPA, and the Noise Control Act. The USAF never considered adjusting the runways, flight paths, or take-offs, as suggested by Valparaiso, or purchasing the impacted homes, as suggested by the EPA, constructing an entirely new airfield, or bedding down the JSF at either Duke Field or Choctaw Field, two airfields that already exist on Eglin Air Force Base and are far removed from the dense populations that surround Eglin Main Base.

161.    Valparaiso's properties, employees and operations have been adversely affected by the USAF's final decision to beddown 59 JSF aircraft at Eglin Main Base without prior consideration of a reasonable range of alternatives. Valparaiso's properties, employees and operations have been injured by the USAF's final decision to beddown 59 JSF aircraft at Eglin Main Base, and such injury is within the zone of interests sought to be protected by NEPA and the Noise Control Act.

162.    The USAF has acted in bad faith by disregarding the significant noise impacts associated with the JSF and failing to consider any alternative other than Eglin Main Base for the beddown of the JSF. Accordingly, this court has the authority to assess attorney's fees against the USAF in favor of Valparaiso.

163.    Valparaiso has hired the law firm of Rose, Sundstrom & Bentley, LLP ("RSB") and is obligated to pay RSB a reasonable attorney's fee.

164.    It is likely that Plaintiff will succeed on the merits.

165.    It is likely that Plaintiff will suffer irreparable harm in the absence of

preliminary relief.

166. The balance of the equities tips in favor of Plaintiff.

167. An injunction is in the public interest.

**COUNT I**
**(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT --FAILURE**
**TO CONSIDER REASONABLE RANGE OF ALTERNATIVES)**

168. Plaintiff incorporates by reference paragraphs 1 through 167.

169. NEPA requires that a reasonable range of alternatives to the proposed actions be examined in a NEPA document. The FEIS prepared by the USAF fails to examine a reasonable range of alternatives for the implementation of the BRAC Act and Commission's Recommendation that the IJTS be sited at Eglin Air Force Base.

170. As noted above, the USAF has purported to consider two action alternatives in addition to the no-action alternative (which the Air Force concluded was not appropriate here due to the BRAC Act). These action alternatives were identified as JSF Flight Training Alternative 1 and JSF Flight Training Alternative 2. Neither flight training alternative considered any significant use of other fields already in place at Eglin Air Force Base. Indeed, the two proposed action alternatives concluded that the lion's share of the flight training operations should be conducted from Eglin Main Base. In reality, these "two action alternatives" presented in the FEIS are one action alternative - beddown the JSF at Eglin Main Base and vary the operations from there.

171. Nowhere does the FEIS, or for that matter, the DEIS, discuss any alternatives that would include realigning the runways already at Eglin Main Base, designing additional runways at Duke Field, designing additional runways at Choctaw Field, or constructing an entirely new runway at some other location within Eglin Air

Force Base. Certainly, with the availability of 724 square miles, the USAF had ample land to beddown the JSF without forcing upon the City the noise impacts that will result from the JSF operating out of Eglin Main Base.

172. The USAF's failure to consider a reasonable range of alternatives to the proposed actions renders the USAF's decision arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law, entitling Plaintiff to the relief requested below.

## COUNT II
## (VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT --FAILURE TO ADEQUATELY CONSIDER ENVIRONMENTAL IMPACTS)

173. Plaintiff incorporates by reference paragraphs 1 through 167.

174. NEPA requires that an Environmental Impact Statement be prepared in compliance with NEPA and discuss the environmental impacts of proposed major federal actions and any adverse environmental effects that cannot be avoided if the proposal is implemented. The Environmental Impact Statement must include discussions of the environmental effects of the proposed action and alternatives to the action.

175. In the FEIS, the USAF failed to adequately consider and evaluate the environmental impacts of the proposed action on, among other things, noise levels as such impact human safety and health, recreational activities within the City, air quality, wildlife and birds, and property devaluation, all resulting from the beddown of the JSF at Eglin Main Base and its operation in association with the IJTS.

176. The USAF failure to adequately consider the environmental impacts of the FEIS renders the USAF's decisions arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required

by law entitling Plaintiff to the relief requested below.

## COUNT III
## (VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT -- FAILURE TO PREPARE ADQUATE ENVIRONMENTAL DOCUMENTATION FOR JSF ACTIVITIES)

177.    Plaintiff incorporates by reference paragraphs 1 through 167.

178.    NEPA requires that an environmental document prepared in compliance with NEPA discuss the environmental impacts of proposed major federal actions and any adverse effects that cannot be avoided if the proposal is implemented. The document must include discussions of the environmental effects of the proposed action and alternatives to the action.

179.    Thus far, notwithstanding the City's unsuccessful attempts to obtain documentation from the USAF through the Freedom of Information Act, the USAF has failed to provide sufficient environmental documentation to support the decision made by the USAF in the ROD. Accordingly, the ROD is not supported by the required environmental documentation under NEPA.

180.    The environmental documentation provided by the USAF is insufficient. The USAF has failed to consider, among other things, the impacts of the STOVL variant of the JSF. There is simply no documentation addressing the impacts of the STOVL.

181.    The USAF's failure to prepare and disclose adequate NEPA documentation for the proposed implementation of the ROD renders the USAF's current and ongoing activities in implementing the ROD and the agency decisions underlying those activities arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law, entitling Plaintiff to the relief requested below.

## COUNT IV
## (NATIONAL ENVIRONMENTAL POLICY ACT -- COMMITMENT OF RESOURCES PRIOR TO FINAL AGENCY DECISION)

182.    Plaintiff incorporates by reference paragraphs 1 through 167.

183.    NEPA's governing regulations require that an Environmental Impact Statement be prepared in compliance with NEPA and that the Environmental Impact Statement not be used to justify a decision already made or action already taken. Furthermore, agencies such as the USAF shall not commit resources prejudicing selection of the alternatives before making a final decision.

184.    The ROD commits the USAF to constructing $160,180,000.00 worth of infrastructure in advance of the USAF having considered a reasonable range of alternatives. Inevitably, the construction authorized by the ROD will be used to later justify the USAF's decision to operate all 107 JSF aircraft out of Eglin Main Base. Simply put, the USAF has put the cart before the horse.

185.    The USAF has admitted that it failed to consider a reasonable range of alternatives in the FEIS. Nevertheless, the USAF intends to beddown 59 JSF aircraft at Eglin Main Base and construct the associated facilities.

186.    Moreover, the USAF decided, before any analysis whatsoever, that it would beddown the JSF aircraft at Eglin Main Base. This entire process, drafting the DEIS, FEIS and ROD, has been predicated upon the USAF's pre-decision (in that it predates the DEIS) that the JSF aircraft would be bedded down at Eglin Main Base. The DEIS and FEIS have been used as tools by the USAF to avoid NEPA's strictures requiring full disclosure and thoughtful analysis and justify the USAF's decision to beddown the JSF aircraft at Eglin Main Base.

55

187. Nowhere in the BRAC Act is there any express or implied requirement that the JSF aircraft be bedded at Eglin Main Base. Likewise, the Commission's Recommendation does not require that the JSF aircraft be bedded down on Eglin Main Base.

188. The USAF's implementation of the ROD violates NEPA's governing regulations by committing resources prior to the SEIS and renders the USAF's current and ongoing activities in implementing the ROD and the agency decisions underlying those activities arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law, entitling Plaintiff to the relief requested below.

## COUNT V
### (VIOLATION OF NOISE CONTROL ACT AND NATIONAL ENVIRONMENTAL POLICY ACT -- FAILURE TO ADDRESS AND IMPLEMENT NOISE CONTROL ACT POLICIES)

189. Plaintiff incorporates by reference paragraphs 1 through 167.

190. The Noise Control Act provides that "it is the policy of the United States to promote an environment for all Americans free from noise that jeopardizes their health or welfare." 42 U.S.C. § 4901(b). In furtherance of this policy, the Noise Control Act requires that federal agencies engaged in any activity resulting in the emission of noise "shall comply with Federal, State, interstate and local requirements respecting control and abatement of environmental noise to the same extent that any person is subject to such requirements." *Id.* § 4903(b)(2). The Noise Control Act also directs that federal agencies shall "to the fullest extent consistent with their authority under Federal laws administered by them, carry out the programs within their control in such manner as to further the policy declared in Section 4901(b) of this title." *Id.* § 4903(a). In addition, NEPA

56

requires that an environmental document prepared in compliance with NEPA discuss the possible conflicts between the proposed action and federal, state, local, and Indian tribal plans, policies, and controls for the area concerned.

191.     In the FEIS, the USAF failed to adequately consider and evaluate the noise impacts of the proposed action in the affected areas, discuss or address conflicts with federal, state, and local noise requirements, or adequately mitigate the noise impacts of the proposed action by limiting, reducing, or modifying the proposed action.

192.     The USAF's failure to comply with the Noise Control Act and NEPA renders the USAF's decisions arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and/or without observance of procedure required by law, entitling Plaintiff to the relief requested below.

WHEREFORE, Plaintiff, CITY OF VALPARAISO, respectfully requests that this Court enter a Judgment against Defendant:

1.     Declaring that the Defendants have violated NEPA for the reasons aforesaid;

2.     Declaring that the Defendants have violated the Noise Control Act for the reasons aforesaid;

3.     Preliminarily enjoining the Defendant from proceeding with the implementation of the ROD without first fully complying with NEPA and the Noise Control Act;

4.     Permanently enjoining the Defendant from proceeding with the implementation of the ROD without first fully complying with NEPA and Noise Control Act;

5.   Assessing attorney's fees against the USAF because it has acted in bad

faith for the reasons aforesaid; and

6.   Granting such other relief as the Court may deem just and proper.

Respectfully submitted this 30th day of March, 2009.

ROSE, SUNDSTROM & BENTLEY, LLP
2548 Blairstone Pines Drive
Tallahassee, FL 32301
(850) 877-6555
(850) 656-4029 FAX

CHRIS H. BENTLEY, P.A.
FL Bar ID No. 121799
chb@rsbattorneys.com
DIANE D. TREMOR, P.A.
FL Bar ID No. 121359
dtremor@rsbattorneys.com
FREDERICK L. ASCHAUER, JR., ESQ
FL Bar ID No.0657328
faschauer@rsbattorneys.com
*For the Plaintiff*